### 28962. FORTSON et al. v. WEEKS.

Per curiam.

This appeal is from a judgment declaring the

"Campaign Financing Disclosure Act" (Ga. L. 1974, p. 155) unconstitutional. We reverse. Parts of the Act are unconstitutional. However, the judiciary will not, and indeed can not, void an enactment of the General Assembly merely because it is defective in part. Constitutional principles dictate that such defective parts be excised and the remainder sustained provided the legislative scheme can be preserved. We have determined that is required here. The attacks upon the Act and our conclusions are set forth in the divisions which follow. As will appear in the opinion, the Act requires public disclosure of contributions and expenditures made in connection with campaigns for certain elective public offices.

1. It is asserted that the body of the Act contains matter not expressed in the title and therefore violates the Georgia Constitution which provides, "No law shall pass which refers to more than one subject matter, or contains matter different from what is expressed in the title thereof." Code Ann. § 2-1908 (Const., Art. III, Sec. VII, Par. VIII). In this regard three attacks are made.

First, it is argued that the title of the Act limits it to "certain State offices" whereas the body of the Act includes other offices, namely "all county and municipal elected officials." We agree. The title of the Act states, "An Act to provide procedures for public disclosure of contributions and expenditures made in connection with campaigns for certain State offices . . ." The body of the Act states its policy and intent is, ". . . to protect the integrity of the democratic process and insure fair elections for the offices of Governor, Lieutenant Governor, Attorney General, Secretary of State, Comptroller General, Commissioner of Agriculture, State School Superintendent, Commissioner of Labor and Public Service Commission, and members of the Georgia House of Representatives and Georgia Senate, all county and municipal elected officials." All county and municipal elected officials are not state officers. *Truesdel v. Freeney,* 186 Ga. 288, 292 (197 SE 783). Therefore, "all county and municipal elected officials" not being included in the title to the Act, their inclusion in the body

of the Act is unconstitutional and the Act can not be enforced as to candidates seeking such offices.

The fact that the title of the Act thereafter refers to later provisions of the Act as applying to candidates for "certain offices" and concludes by stating "and for other purposes" does not alter our conclusion. The purpose of the title is to place members of the General Assembly on notice generally as to the subject matter of the legislation. As stated in *Prothro & Kendall v. Orr,* 12 Ga. 36, 43, "To prevent fraud and surprise, how important it is, that the members [of the General Assembly] should be notified at least by the Title of the Act, of the subject matter about which they are legislating; at any rate, that they should not be misled by the Title," and, "Had the Title been general — as for instance, an act in relation to the public officers, or for the particular objects designated, and for other purposes — the construction would have been different. But here the Title is definite, and therefore, necessarily limited. And to permit other and totally different matter to be incorporated, would be to let in the very mischief intended to be prevented; and thus render the Constitution of none effect." Id., p. 41. In our opinion a reasonable construction of the title requires a conclusion that the Act related only to "certain state offices."

Although the inclusion of "all county and municipal elected officials" is unconstitutional, this does not render the entire Act unconstitutional. As stated by Justice Lumpkin in *Hancock v. State,* 114 Ga. 439, 442 (40 SE2d 317), "It often happens that a portion of an Act not covered by its title must be treated as unconstitutional, while the remainder of it which is covered by the title is upheld. It would not be difficult to give instances of this kind ad nauseam. The rule applicable to such a question as that now before us was well stated by the present Chief Justice of this court in *Elliott v. State,* 91 Ga. 694, 696 [17 SE 1004]. He said, 'When a statute can not be sustained as a whole, the courts will uphold it in part, when it is reasonably certain that to do so will correspond with the main purpose which the legislature sought to accomplish by its enactment, if, after the objectionable part is stricken, enough remains to accomplish that purpose.

But if the objectionable part is so connected with the general scope of the statute that, should it be stricken out, effect can not be given to the legislative intent, the rest of the statute must fall with it.' " As we view the Act its purpose is "to protect the integrity of the democratic process and to insure fair elections." The Act does not purport to include all elective offices and the fact that "all county and municipal elected officials" must be deleted because not encompassed in the title does not destroy its main purpose or scheme. These are merely categories of elected officials. The scheme of the Act setting forth the requirements and providing the procedures "to protect the integrity of the democratic process and to insure fair elections" has not been disturbed.

Next, it is argued that the title of the Act states, "to provide for the investigation by the Attorney General of any apparent violations of this Act" whereas the body of the Act fails to mention the Attorney General. In our opinion this does not render the Act unconstitutional. It is mere surplusage. The Act gives the Attorney General no authority in addition to that which he may otherwise have by law. The scheme of the Act is not destroyed. The Act is penal with fine and imprisonment being specified for its violation. Such violations may be prosecuted by the appropriate prosecutorial officers of this state. The campaign financing disclosure reports are required to be filed with the Secretary of State and made available for public inspection. If violations of the Act come to the attention of appropriate prosecutorial officers, it is their duty to prosecute such violations. Furthermore, the fact that the title states the Attorney General was given authority to investigate apparent violations of the Act, in our opinion, could not have misled the members of the General Assembly to believe violations of the Act were not subject to prosecution as any other criminal violation. The title clearly provides, "to provide for penalties for violations of this Act." The penalties are fine and imprisonment which must be pursued by the appropriate officer in the appropriate criminal court of this state.

Finally, it is pointed out that the title of the Act states, "to provide for the filing of campaign disclosure

reports by certain candidates and by officers of certain campaign committees," and, "to provide for the promulgation of rules and regulations." This is provided for in the body of the Act by designating who must file the reports, when they shall be filed, the content of the reports, and that they shall be filed with the Secretary of State who is directed to retain such reports for five years and make them available for public inspection. The Secretary of State is authorized to promulgate rules and regulations to carry out the Act. There is no quarrel with these provisions.

However, the body of the Act establishes a "State Campaign Ethics Commission." It is invested with the duty and power to "make rules as are necessary to administer this Act and to carry out its duties under this Act," to "receive and review documents filed with it . . ." to make such documents available to the public and appropriate prosecutorial officers, and to make an annual report to the General Assembly. It is argued that nowhere in the Act are candidates or other persons required to file documents with the "Commission"; that these are directed to be filed with the Secretary of State and, consequently, there are no duties for the "Commission" to perform. We agree. Nowhere in the Act does it appear that the "Commission" has any administrative duties to perform or which would require it to promulgate rules. The administrative duties of receiving and filing the required campaign reports and making rules therefor are placed upon the Secretary of State. It appears the "Commission" is given "carte blanche" authority to adopt whatever rules it deems appropriate to carry out whatever duties it desires to assume. Such sweeping authority can not be sustained under the provision of the title which states, "to provide for the promulgation of rules and regulations." In our opinion that portion of the title as well as the "catchall" provision "and for other purposes" is insufficient to place the members of the General Assembly on notice as to what we interpret as the "Commission's" undefined and apparently unlimited authority. On the other hand, if the "Commission's" duties and powers are strictly limited to the establishment of rules for administrative purposes it

has no function because these administrative duties have been reposed in the Secretary of State with whom the reports are filed. Therefore, we hold that the provisions establishing a "State Campaign Ethics Commission" is unconstitutional because such matter is not contained in the title of the Act. However, upon the constitutional principles recognized above we find that the elimination of the "Commission" does not require a declaration that the entire Act is unconstitutional. Its principal scheme is still intact. The candidates for the offices covered by the Act must publicly disclose their campaign contributions and expenditures by filing reports thereof with the Secretary of State.

2. It is contended that the Act is vague and ambiguous because it requires a financing disclosure report to be filed "15 days prior to the general election campaign." Taken out of context this contention would appear to have validity. However, in our opinion the provision wherein this appears when read in its entirety places a candidate on notice as to when such reports must be filed. The provision states, "Such campaign financing disclosure reports shall be filed 45 days and 15 days before the primary election, and 10 days after the primary election. Candidates in a general election campaign shall make such reports 15 days prior to the *general election campaign* and all campaign candidates shall make a final campaign disclosure report no later than December 31 of the year in which the election occurs." (Emphasis supplied.)

It seems obvious to us that the particular phrase complained of inadvertently inserted the word "campaign" and does not confuse the clear intent that a disclosure report shall be filed "15 days prior to the general election . . ." The provision requires reports before and after the primary election. Similarly, it requires reports before and after the general election. We conclude that the word "campaign" in the phrase complained of is an obvious clerical and typographical error and should be ignored.

3. It is argued that such terms as "family," "firm," "partnership," "committee," "association," "labor organization," and "organization or group of persons" are

not defined in the Act and are too vague to be enforced. These terms are used in defining a "person" under the Act. They are also used in connection with the requirements that contributions and expenditures of $101.00 or more must be reported. For instance, the Act provides, "When separate contributions of less than $101 are knowingly received from a common source, they shall be aggregated annually for reporting purposes. For purposes of fulfilling this requirement, members of the same family, firm or partnership, or employees of the same person, as herein above defined, shall be considered to be a 'common source.'" It also provides that the chairman or treasurer of campaign committees keep a detailed and exact account of "The name and mailing address of every person making any contributions and the amount of such contributions"; and, "All expenditures made by a candidate or the campaign committee of $101.00 or more in amount and for any such expenditure of a lesser amount if the aggregate amount of such expenditure to the same person during a calendar year exceeds $101." In our opinion when these terms are given a reasonable meaning and the provisions wherein they appear are given a reasonable construction the Act is not too vague to be enforced.

4. It is contended that the Act violates the equal protection clauses of the Federal and State Constitutions by establishing an arbitrary class of "certain State offices." See *Truesdel v. Freeney,* 186 Ga. 288, supra. In resolving this question it is to be noted that we have already concluded that the Act covers only those offices of state government individually named. We have excluded all county and municipal officers because they were not included in the title. The individual offices named in the Act are all of the offices of the executive and legislative branches of the state government filled by public election. In our opinion this is a reasonable classification. The only public elective offices of State Government not included within the Act are justices of this court, judges and district attorneys. District attorneys are generally considered to be quasi judicial officers. 27 CJS 622, § 1; 63 AmJur2d 337, § 1. The judiciary is a separate independent branch of State

government. It is a recognized classification under our constitutional form of government. It has also been established that the inherent power to control the judicial branch of government is vested in the Georgia Supreme Court and rules and regulations for conduct have been promulgated not only for judges but for all attorneys. *Wallace v. Wallace,* 225 Ga. 102 (166 SE2d 718). It may be noted that attorneys are the only persons eligible for the said offices of Justice and Judge.

The Georgia Code of Judicial Conduct adopted before the enactment of the Campaign Financing Disclosure Act is an example of the action that has been taken. The Code among other things provides for the conduct of justices and judges as well as candidates for these judicial offices, including a prohibition against soliciting or accepting campaign funds. This must be handled by committees of responsible persons during limited periods. There are other limitations upon not only a judge's personal conduct but upon his political activity. There is also a requirement that a judge must file an annual statement of any extra compensation received for personal services. See 231 Ga. A-1 et seq. In addition, there is a Constitutional Commission which may remove judges for misconduct. See 231 Ga. A-17 et seq. Attorneys are also subject to disciplinary rules prescribed by the Supreme Court. From this it is apparent that not only is the judiciary a separate classification from the executive and legislative branches of government but that rules and procedures have already been established to assure appropriate conduct for justices, judges, district attorneys, and lawyers not only during political campaigns but at all other times. We hold that the classification contained in the Act is reasonable and there is no denial of equal protection under either the Federal or State Constitution.

5. It is contended that the Act violates the constitutional guaranty of freedom of speech and of the fundamental political rights of the people. It is argued that, "no court in this country . . . has yet explicitly upheld a law requiring the disclosure for the sake of disclosure of persons who associated together for a purely political purpose." It is stated that, "The recording and

reporting requirements [of the Act] are intended to and will chill First Amendment rights without any legitimate purpose." The argument recognizes that a compelling governmental interest permits some intrusion upon an individual's personal affairs. However, it is asserted that the Act here is overbroad by compelling general disclosure of contributions to certain political campaigns; that the Act will "discourage citizens from exercising their rights in the full elective process . . . no matter how noble and lofty-sounding [its] aims may be"; that the state, "may not make broad and unlimited inquiries about a person's beliefs or associations because such questions, by deterring others from joining . . . [associations to effect a common political objective], necessarily chill and inhibit the exercise of First Amendment rights by all citizens"; and that, "The necessity for such protection is obvious. Without it, present and potential members of an association would not exercise their right to associate for fear that public awareness of their membership will lead to reprisal or retaliation."

We do not agree. Some of the fears expressed above may result from a misinterpretation of the definition of "contribution" set forth in the Act. It states, " 'contribution' means a gift, subscription, loan, forgiveness of debt, advance or deposit of money or anything of value conveyed or transferred for the purpose of influencing the nomination for election or election of any person for the offices provided for in Section 2." The definition of "contribution" presents no problem so long as outright contributions of money are involved. Where the definition becomes difficult is in the area of publicity for candidate—an area in which the bulk of the candidate's campaign expenditures will probably be made, but also in an area in which the citizen is entitled to exercise freely his First Amendment rights in support of his chosen candidate. We conclude that the donation of volunteer services to a candidate's campaign does not constitute a "contribution" within the meaning of the Act and was not intended by the legislature to be the subject of reporting and disclosure. This means that the private citizen's act of espousing or endorsing his candidate

through his personal spokesmanship, whether to a private or a public audience, is not a "contribution." This activity might take the form, for example, of propagandizing among one's friends, or putting up campaign posters. However, where one expands his audience by purchasing, for example, an advertisement promoting the candidate in a newspaper, money changes hands and the question must be faced whether such an activity is a "contribution."

The Act prohibits the making of a contribution except to the candidate or his campaign committee. However activities in the exercise of First Amendment freedoms may not be harshly channeled and controlled simply by being deemed "contributions," for those activities are constitutionally protected from significant legislative chilling. Accordingly, even though we conclude that the purchase of media publicity for a candidate, the example here under consideration, is a "contribution" because it is covered by the Act's definition, we construe this Act to mean that this and other financial outlays by persons in the course of the exercise of First Amendment rights, shall be deemed to be the equivalent of a direct contribution to the candidate or his campaign committee, so that the contributor is not in violation of the Act.

These contributions, of course, are subject to the reporting requirement of the Act. This does put upon the candidate or his committee the obligation to report such contribution if within his knowledge or if such knowledge might be discovered by reasonable inquiry. We conclude that this was the intent of the legislature and we see no constitutional obstacle to this reading. An inquiry to the advertising medium used should enable the candidate or his committee to learn the identity of the sponsor and therefore to report it as required.

This leaves finally the problem of the "phantom advertiser" whose identity cannot be learned through normal inquiry. We do not think this situation will often occur, because the tendency of those who make political contributions is to desire that the candidate know of their support. However, when it does occur, the candidate will

be unable to give the name and address of the contributor. This does not put him in violation of the Act, however, because this would not be a "knowing" violation within the meaning of Section 10 of the Act concerning penalties. Alternatively, the candidate might report that the publicity had occurred but that it had been done anonymously.

In short, we do not think the problem of the phantom advertiser is great enough to undermine the purpose of the legislation to accomplish substantial disclosure, or that it threatens the candidate or his committee with being put in violation of the penal provisions through acts of others beyond their control.

This leaves only the question of whether a person has a constitutional right to remain anonymous in his support of a political candidate. Conceding for the purposes of argument that anonymity in this regard is a constitutional right, it is not absolute and must yield to compelling state interests. Balancing governmental interest in protecting the integrity of the democratic process and to insure fair elections against an individual's fundamental rights, we conclude that the limited intrusion here is constitutionally permissible. United States v. Harriss, 347 U. S. 612, 626 (74 SC 808, 98 LE 989). It is in the public interest to disclose who is financing political candidates. Any right to anonymity in this regard must yield to the public's right to know who is "behind the scene." Such information permits the voters to more intelligently appraise a candidate's true position on public affairs. "This form of regulation of campaign financing has been justified as preventing corruption and undue influence. Presumably, if the required reports were comprehensive in scope and fully publicized, several substantial benefits might be expected to follow. Contributions motivated by the expectation of exerting undue influence upon the candidate after his election might be discouraged by the publicity. Conversely, decisions and appointments by an office-holder favoring the interests of known large contributors might be inhibited. If disclosure and publicity were prompt, the voter would have some additional knowledge about the candidates and their

respective supporters that would be helpful to him in deciding for whom to vote." Rosenthal, Campaign Financing and the Constitution, 9 Harv. J. Legis. 359, 403 (1972).

6. It is contended that Section 4 (c) of the Act which prohibits anonymous contributions and directs such contributions be deposited in the State Treasury is unconstitutional. It is argued that this is taking private property without compensation. We do not agree. Under the Act an anonymous contribution never becomes the property of the candidate or his committee. They are prohibited from accepting it. The contributor is unknown. In these circumstances we see no reason why the state can not require such anonymous political contributions to be placed on deposit in the State Treasury.

7. It is contended that the Act is unconstitutional because it is retroactive in that it requires the reports to disclose certain contributions received prior to its adoption. In this regard, Section 6 of the Act requires that the reports filed with the Secretary of State shall include contributions received and expenditures made in behalf of the candidate during the twelve months preceding the date of the report. Section 6 also contains the following: "Where a candidate or campaign committee has accepted contributions or made expenditures prior to the effective date of this Act, the reports required by this section shall include such information as the records of the candidate or his committee show, and such information as is otherwise known to the candidate or members of his committee, regarding such prior contributions and expenditures."

The Georgia Constitution provides that no ex post facto law, retroactive law, or law impairing the obligation of contracts shall be passed. Code Ann. § 2-302. In the case of *Bullard v. Holman,* 184 Ga. 788 (193 SE 586, 113 ALR 763) (1937), this court said at page 792: "In the rulings just cited this court has definitely settled the law to be that our Constitution forbids the passage of only those retroactive, or rather retrospective, laws which injuriously affect the vested rights of citizens. The general rule throughout the United States is that a state

legislature may constitutionally repeal, alter, or modify state laws enacted under the police power for the protection of the public, without violating any express or implied constitutional prohibition against retroactive statutes."

We hold that Section 6 of the Act, though restrospective in its requirements, does not affect vested rights of citizens so as to offend constitutional prohibitions against the enactment of a restrospective statute.

8. It is contended that the disclosure of contributions to political campaigns violates the right to a secret ballot. We find no merit in this contention. A campaign contribution can not be equated with a secret ballot.

9. Other contentions of unconstitutionality of the Act raised in the petition have not been argued in this court by the appellee. Suffice it to say that we have reviewed these contentions and find them to be without merit.

10. Finally, we conclude that the plaintiff had standing to attack the Act on the basis presented here. It must be remembered that although he is a candidate for public office he is also a citizen who complains that the Act not only inhibits his constitutional rights as a candidate but also as a citizen to make contributions to other candidates.

*Judgment reversed. All the Justices concur, except Nichols, P. J., and Undercofler, J., who dissent, and Jordan, J., who dissents from the ruling made in Division 7. Gunter, J., concurs specially in the ruling made in Division 5, and Ingram and Hall, JJ., concur specially in Division 6.*

ARGUED MAY 21, 1974 — DECIDED JUNE 20, 1974 — REHEARING DENIED JULY 9, 1974.

*Arthur K. Bolton, Attorney General, Robert S. Stubbs, II, Executive Assistant Attorney General, Don A. Langham, Andrew J. Owen, Jr., Assistant Attorneys General,* for appellants.

*Heyman & Sizemore, Lamar W. Sizemore, Ralph G. McCallum, Terry P. McKenna, Robert A. Bartlett,* for appellee.

*Stan M. Lefco, Dave Hendrick, Nathan Crystal, Robert Windholtz, B. J. Powell, Gary Ackerman, Timothy S. Perry,* amicus curiae.

GUNTER, Justice, concurring specially with respect to Division 5 of the majority opinion.

I concur in the judgment of reversal and with each of the divisions of the majority opinion except Division Five. Division Five deals with the infringement by the Act upon First Amendment rights of expression.

The majority acknowledges in Division 5 that the Act prohibits the making of a contribution except to the candidate or his campaign committee. However, the majority then says that "activities" in the exercise of First Amendment freedoms may not be harshly channeled and controlled.

Were I to adopt this stated position, I would have to hold that the Act is unconstitutional as violative of the First Amendment. But I do not adopt that position, and I do not think that the Act, as written by the legislature, violates the First Amendment.

Section 4 of the Act says very plainly: "No contributions to bring about the nomination or election of a candidate for any office provided for in Section 2 shall be made except *directly* to a candidate or to his campaign committee which is organized for the purpose of bringing about the nomination or election of any such candidate . . ." This same language is later reiterated by the legislature in the same paragraph: "No contribution shall be made except to the candidate or his campaign committee."

The majority has judicially construed this language, which to me needs no construction, to mean that contributions made to persons other than the candidate or his campaign committee are the "equivalent" of contributions made to the candidate or the campaign committee.

I would flatly hold that the making of a political campaign contribution to anyone other than the

candidate or his campaign committee is a violation of the Act. It is plain to me that the legislature intended to prohibit the making of political campaign contributions to anyone other than to the candidate or his campaign committee.

However, it is my view that the First Amendment affords no protection to the "making of campaign contributions" as the term "contributions" is defined in the Act. In other words, the making of campaign contributions in a political campaign is "conduct" that is not protected by the First Amendment, and the legislature can, in my opinion, place limitations and restrictions on such "conduct" without violating First Amendment rights.

I think that it is clear from the over-all content of the Act that it asserts no prohibition against free expression or association. Any person may express and urge support for or against any candidate, and there is no ban against association with any candidate for the specified offices. The Act merely says that campaign "contributions" cannot be made to anyone other than the candidate or his campaign committee, and it provides that when contributions are made in the manner specified in the Act, then they shall be reported and publicly disclosed.

"Contribution" as defined by the Act means anything of value conveyed or transferred for the purpose of influencing the nomination or election of a candidate. As I view this definition, "conveying or transferring" anything of value is not speech or expression within First Amendment terms. It is activity or conduct, and such activity and conduct can legitimately be restricted and limited in the public interest pursuant to the police power of the state.

The making of political campaign contributions, defined by the terms of the Act as transferring or conveying anything of value for the purpose of influencing the candidacy of a candidate, cannot, in my judgment, be equated with freedom of speech or freedom of association rights.

I would therefore hold that the First Amendment does not prohibit the legislature from placing restrictions

and limitations on the making of political campaign contributions. I would also uphold the constitutionality of the Act as written by the legislature, rather than construing it to mean that contributions made to others than the candidate or his committee are to be constructively attributed to the candidate or his committee.

In United States v. O'Brien, 391 U. S. 367 (88 SC 1673, 20 LE2d 672) (1967), the Supreme Court of the United States said: "This court has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitation on First Amendment freedoms." P. 376.

I do not agree that the Act as written affects First Amendment freedoms, but even if I did make that concession, it is my contention that the state's interest in requiring public disclosure of campaign contributions is sufficiently important to justify any incidental limitations on expression and association imposed by this Act.

I concur in the judgment of reversal.

INGRAM, Justice, concurring specially in Division 6 of the opinion.

I am reluctant to add to the volume of the court's opinion in this case because of its already burdensome length. Nevertheless, I am constrained to express my discontent with the brevity of our holding in Division 6 of the court's opinion. It rules on the issue presented and I agree it is correct. But, I find it just as incomplete as the Act itself in requiring the deposit of anonymous contributions with the state. The Act does not require state confiscation of these funds but it fails to provide what is to be done with them. Hopefully, there will be none or that future legislation will cure this omission as well as correct the other deficiencies in the Act which are pointed out in the main opinion. In the interim, I would suggest that perhaps any anonymous contributions will eventually become a part of the general treasury of the state if no claimant casts aside his cloak of anonymity

and steps forward within a reasonable time to establish his ownership to a specific contribution. How this can be handled is an enigma under the present Act. But I think we need to express the opinion that even under the present Act, the funds must be regarded as escrow monies that belong to the contributor and he must have a reasonable opportunity to recover them from the state before they are allowed to flow into the main body of public revenues to disappear forever from private ownership.

I am authorized to state that Justice Hall concurs in this special concurrence.

HALL, Justice, concurring in Division 4 and the judgment.

1. The "Campaign Financing Disclosure Act" states in its title that its purpose is "to provide procedures for public disclosure of contributions and expenditures made in connection with campaigns for certain State offices . . ." As constitutionally interpreted under its title, it includes "the offices of Governor, Lieutenant Governor, Attorney General, Secretary of State, Comptroller General, Commissioner of Agriculture, State School Superintendent, Commissioner of Labor and Public Service Commission, and members of the Georgia House of Representatives and Georgia Senate . . ." All are offices of the Executive and Legislative branches of the State Government filled by public election. The appellee contends that the Act violates the equal protection clauses of the Federal and State Constitutions in that it excludes other state officers—judges and district attorneys. These excluded offices are found in Article VI (Judiciary) of the Georgia Constitution of 1945. Is this constitutionally impermissible classification? In my opinion it is not.

Under the equal protection clause, typically a "two-tier" analysis of a statute is given. We should ask whether a "suspect" classification is made, or whether a "fundamental" right is infringed. If our answer is yes to either, strict judicial scrutiny is appropriate. If not, the familiar "rational relationship" test is applied. In considering this campaign disclosure law, the

fundamental rights of free speech and the vote must not be confused with the actual claims presented here: the asserted right of the citizen to make a non-disclosed political contribution, and the asserted right of the candidate not to disclose the source of his campaign funding. A classification which distinguishes between the judicial and the other branches of government is not "suspect"; the "rights" with reference to campaign contributions are not "fundamental" rights expressly protected by our or the Federal Constitution. See generally, Developments in the Law: Equal Protection, 82 Harv. L. Rev. 1065, 1087-1132.

Our test is therefore whether there is a rational relation between the classification made and the object of the legislation. See, San Antonio Independent School District v. Rodriguez, 411 U. S. 1 (93 SC 1278, 36 LE2d 16). Though perhaps a more thorough judicial analysis of legislative ends and means is signalled by the recent cases of United States Dept. of Agriculture v. Moreno, 413 U. S. 528 (93 SC 2821, 37 LE2d 782) (eligibility for food stamps); Weber v. Aetna Casualty & Surety Co., 406 U. S. 164 (92 SC 1400, 31 LE2d 768) (rights of illegitimate children under workmen's compensation law); Eisenstadt v. Baird, 405 U. S. 438 (92 SC 1029, 31 LE2d 349) (availability of contraceptives); and Reed v. Reed, 404 U. S. 71 (92 SC 251, 30 LE2d 225) (preference of male sex for administrator of decedent's estate); still we do not apply the test of strict judicial scrutiny to these less stringently protected rights. See, The Supreme Court, 1972 Term, 87 Harv. L. Rev. 57, 105-133.

Chief Justice Cardozo told us that "Legislation is not void because it hits the evil that is uppermost. Equally it is not void because it hits the evil that is nearest." People v. Teuscher, 248 N. Y. 454, 460 (162 NE 484). The legislature is free to discern, or to think that it discerns, a greater need to protect the integrity of the democratic process in public elections of state officers in the legislative and executive branches of government than those within the judiciary. It may move to attack a harm where it is perceived, without any necessity for moving against it on other fronts where it may also be found. See, McGowan v. Maryland, 366 U. S. 420 (81 SC 1101, 6 LE2d

393). Cf., Williamson v. Lee Optical of Oklahoma, Inc., 348 U. S. 483, 489 (75 SC 461, 99 LE 563); United States v. Carolene Products Co., 304 U. S. 144, 151 (58 SC 778, 82 LE 1234); James-Dickinson Farm Mortgage Co. v. Harry, 273 U. S. 119, 125 (47 SC 308, 71 LE 569).

There could be no more reasonable classification than to distinguish the judicial branch of government from the executive and legislative branches. The separation of these three branches was one of the bedrocks upon which the Federal Constitution was built. As Chief Justice Marshall said, "the legislature makes, the executive executes, and the judiciary construes the law." Wayman v. Southard, 10 Wheat. (23 U. S.) 1, 46 (6 LE 253). Our state Constitution places each branch in a separate Article. The judicial oath of office is different, requiring judicial officers to swear that they will "impartially" perform their duties of office. See Code §§ 24-2605 and 24-4004. No such requirement is found in the oath for officers of the other two branches. See Code Ann. § 2-3009. The reason for this is obvious. The members of the legislative and executive branches of government are expected to reflect the political views of a party and a constituency. A judge should not. Neither should he reflect the constantly changing majority view of public opinion at any given moment. His task is the impartial administration of the law.

This classification was recently asserted by both the legislature and the people of Georgia in 1972 by the enactment of a constitutional amendment creating the Judicial Qualifications Commission. Ga. L. 1972, p. 1364. The commission, composed of citizens, lawyers and judges, has authority to investigate complaints by any citizen about any court or any judge or justice in Georgia. Its power of investigation includes "wilful misconduct in office, or wilful persistent failure to perform his duties, or habitual intemperance; or for *conduct prejudicial to the administration of justice which brings the judicial office into disrepute.*" (Emphasis supplied.) After investigations and hearings, a judge or justice of any court of the state can be removed from office or otherwise disciplined in accordance with prescribed procedures. This constitutional amendment relates solely to the

judicial branch of government and seeks "to preserve the integrity of the judicial process." Report of the Governor's Commission on Judicial Processes, p. 1 (1971).

In keeping with the mandate of the constitutional enactment, this Court on December 17, 1973, adopted a "Judicial Code of Conduct" for the judicial branch of government. Canon 7 specifically regulates the conduct of candidates in an election, including an incumbent judge, for a judicial office. A candidate may not "make pledges or promises of conduct in office other than the faithful and impartial performance of duties of his office, [nor] announce his views on disputed legal or political issues . . ." The handling of campaign funds is provided for in the Canon.[1]

Finally, it is common knowledge that in the past fifty years contested judicial elections are the exception, not the rule. It is also common knowledge that campaign contributions in these few races are usually de minimis.

Considering the office of District Attorney, it is not per se a judicial office, but the people of Georgia as well as the legislature have seen fit to treat it as part of the judicial branch of government. The Constitution of 1945 places the office in the judicial branch (Article VI) along with the judges and justices. The oath of the office of

---

[1] "A candidate, including an incumbent judge, for a judicial office that is filled by public election between competing candidates should not himself solicit or accept campaign funds, or solicit publicly stated support, but he may establish committees of responsible persons to secure and manage the expenditure of funds for his campaign and to obtain public statements of support for his candidacy. Such committees are not prohibited from soliciting campaign contributions and public support from lawyers. A candidate's committees may solicit funds for his campaign no earlier than six (6) months before a primary election and no later than the date of the last election in which he participates during the election year. A candidate should not use or permit the use of campaign contributions for the private benefit of himself or members of his family."

district attorney is similar to the judicial oath in that it requires that they will "impartially" perform their duties of office. Code § 24-2902. The legislature has historically seen fit to include them with all other judicial offices in Title 24 (Courts) of the Code of Georgia while all of the state offices covered in the "Campaign Financing Disclosure Act" are found in Title 40 (Executive Department) or Title 47 (General Assembly). It is also common knowledge that contested elections for the office of district attorney are similar to judicial elections in that they are the exception rather than the rule.

In summary, it cannot be said that the legislature has made an invidious classification having no rational relation to the object of the legislation. We must not forget that "the correcting statute may be as narrow as the mischief." Williams v. Mayor &c. of Baltimore, 289 U. S. 36, 46 (53 SC 431, 77 LE 1015).

2. Having found that the provisions concerning county and municipal officers and the Ethics Commission are unconstitutional for the reason that these matters are "different from what is expressed in the Title" of the Act, we must answer the question whether the general legislative scheme may be preserved or whether it has been destroyed. Bennett v. Wheatley, 154 Ga. 591, 594 (115 SE 83). The answer is found in the opening words of the Act's Title, "An Act to provide procedures for public disclosure of contributions and expenditures made in connection with campaigns for certain state offices . . ." It is disclosure which is sought. That is the general legislative scheme and as such it remains intact. To paraphrase Mr. Justice Frankfurter's wisdom on the reading of statutes, we have not picked plums from a pudding; we have pulled threads from a pattern.

It must be conceded that the Act does not read like the close mesh syntax of the "Epistles" of Saint Paul; however, the same criticism can be leveled at judicial opinions in the state and federal courts. Legislators, like judges, are fallible human beings subjected to the pressures of conflicting viewpoints and the race against time. "We do not pause to consider whether a statute differently conceived and framed would yield results

more consonant with fairness and reason. We take this statute as we find it." Anderson v. Wilson, 289 U. S. 20, 27 (53 SC 417, 77 LE 1004).

Both this court and the Supreme Court of the United States have stated that the starting point for determining legislative purpose is plainly an appreciation of the "mischief" that the legislature was seeking to alleviate. *Henderson v. Alexander,* 2 Ga. 81, 85; I. C. C. v. J. T. Transport Co., 368 U. S. 81, 107 (82 SC 204, 7 LE2d 147). "Legislation has an aim; it seeks to obviate some mischief, to supply an inadequacy, to effect a change of policy, to formulate a plan of government. That aim, that policy is not drawn, like nitrogen, out of the air; it is evinced in the language of the statute, as read in the light of other external manifestations of purpose. That is what the judge must seek and effectuate, and he ought not be led off the trail by tests that have overtones of subjective design." Frankfurter, Some Reflections on the Reading of Statutes, 47 Col. L. R. 527, 538-539.

One would have to be deaf not to have heard the clamor throughout our state and nation both for and against proposed election reforms including the reporting and disclosure of campaign contributions. This involves matters of public policy which present conflicts of values and clashing political views. As Cardozo said many years ago, "Within the field where men of reason differ, the legislature must have its way." Williams v. Baltimore, supra, 289 U. S., p. 42.

In the long run the people of our state and nation could hardly be expected to be more tolerant of judicial condemnation of reasonable efforts by state legislatures to protect the integrity of the elective process than they were some decades ago of federal court nullification of state legislative efforts to advance their economic welfare or protect the security of their lives and property. See, e.g., Lochner v. New York, 198 U. S. 45, 74 (25 SC 539, 49 LE 937) (Holmes, J., dissenting). See generally, Wechsler, Toward Neutral Principles of Constitutional Law, 73 Harv. L. Rev. 1, 23-26. Absent a debilitating constitutional flaw in this Act, this court must try as best it can to effectuate the common will expressed in the underlying purpose of the legislature. To go beyond this

is to usurp a power which our constitutions have lodged in our elected legislature. See, Hand, The Spirit of Liberty 109; Wechsler, supra, 73 Harv. L. Rev. 1.[2] The heart of this legislation can be, and therefore must be, preserved.

I am authorized to state that Chief Justice Grice and Justice Ingram concur in this opinion.

UNDERCOFLER, Justice, dissenting.

The attacks upon the Act here fall into two general categories, namely form and substance.

The attacks based upon form arise from Georgia's constitutional provisions that the body of an Act must not contain matter different from the title. The provision requires this court to void as unconstitutional an Act in which the title and body are different. But this court is

---

[2] "The courts have both the title and the duty when a case is properly before them to review the actions of the other branches in the light of constitutional provisions, even though the action involves value choices, as invariably action does. In doing so, however, they are bound to function otherwise than as a naked power organ; they participate as courts of law. This calls for facing how determinations of this kind can be asserted to have any legal quality. The answer, I suggest, inheres primarily in that they are—or are obliged to be—entirely principled. A principled decision, in the sense I have in mind, is one that rests on reasons with respect to all the issues in the case, reasons that in their generality and their neutrality transcend any immediate result that is involved. When no sufficient reasons of this kind can be assigned for overturning value choices of the other branches of the Government or of a state, those choices must, of course, survive. Otherwise, as Holmes said in his first opinion for the Court, 'a constitution, instead of embodying only relatively fundamental rules of right, as generally understood by all English-speaking communities, would become the partisan of a particular set of ethical or economical opinions . . .' " 73 Harv. L. Rev. 19.

also under a mandate to construe an Act so as to uphold its constitutionality. Consequently, where the title and the body of an Act are different with regard to certain provisions the court strikes the unconstitutional provisions but sustains the remainder of the Act provided its scheme has not been destroyed. In essence the court concludes that the legislature would have adopted the Act even if it had not contained the provisions which are deleted. These principles are difficult to apply in many instances. However, in my opinion there is a point at which the court passes beyond its authority to construe an Act so as to uphold its constitutionality and begins to edit the Act for the same purpose. I have concluded the majority opinion here has passed that point.

The majority of the court has held that the title of this Act is limited to certain state offices. Accordingly, they have stricken from the body of the Act coverage for all county and municipal officers. Also, the title to the Act invests the Attorney General with investigative powers. The majority has held this is mere surplusage because the body of the Act makes no mention of the Attorney General and certainly fails to give him any investigative authority with respect to this Act. Similarly the majority has held that the title of the Act fails to make mention of the Ethics Commission and consequently the Ethics Commission established in the body of the Act is declared unconstitutional and stricken. These significant portions of the Act have been nullified. Standing alone perhaps any one of these deletions would not have been sufficient to warrant a finding that the entire Act is unconstitutional. However, the total effect of the deletions here compels me to conclude that the legislature would not have adopted the Act with all these provisions removed. Accordingly, I am of the opinion that the Act is unconstitutional.

There are numerous attacks upon the substance of the Act. The two most critical involve questions of equal protection of the law and a person's right of free speech together with fundamental rights to associate and engage in political activities. The conclusion of the majority that county and municipal officers are not covered by the Act because not contained in the title eliminates difficult

substantive constitutional questions of equal protection of the laws. However, without the deletion of these officials the Act includes certain judges who are classified as county officers and does not include other judges, such as ourselves, classified as state officials. In my opinion there would be no reasonable basis justifying the distinction in the Act as written and the classification would have been unconstitutional as a denial of the equal protection of the laws and the entire Act would have to fail. A similar result would have followed because the body of the Act includes county prosecutorial officers and does not include district attorneys, who are state prosecutorial officers.

The most serious defect in the Act is its intrusion upon fundamental rights of free speech and free association. It requires disclosure of identity when making a "contribution" to a political candidate. Only the most compelling reasons will authorize such an intrusion. As stated by the United States Supreme Court in Gibson v. Florida Legislative Investigation Committee, 372 U. S. 539, 544 (83 SC 889, 9 LE2d 929): "The First and Fourteenth Amendment rights of free speech and free association are fundamental and highly prized and 'need breathing space to survive.' [Cit.] 'Freedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference.' [Cit.] . . . It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute an effective restraint on freedom of association. This court has recognized the vital relationship between freedom to associate and privacy in one's associations. Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs. . . At the same time, however . . . there can be no question that the state has power . . . to act and protect its legitimate and vital interests . . . Where there is a significant encroachment upon personal liberty, the state may prevail only upon showing a subordinating interest which is compelling." "The delicate and difficult task falls upon the courts to weigh

the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights." Id., p. 545.

The argument advanced here to justify the intrusion is that the public should know what persons are lending aid to a candidate in order that the voters may evaluate to what extent the candidate may be corrupted by such persons. What the argument overlooks is that all "contributions" are not made for corrupt purposes. Many are made in support of worthwhile programs by sincere public spirited persons who do not wish their identity to be disclosed. Such persons entertain no nefarious purposes and I conceive it to be their right to remain anonymous if they so elect. There are others who may wish to "contribute" anonymously for no reason other than to avoid possible retaliation by any opponent or merely because they do not want any publicity. The Act in requiring disclosure of all "contributions" may have eliminated those made for corrupt purposes but it has sacrificed those made benevolently. At the same time it has invaded rights of free speech and free association. Unquestionably there is a compelling state interest in eliminating corruption by campaign "contributions." In my opinion this can be done without sacrificing individual freedoms. However, it will take a more carefully drawn enactment than is presented here. As has been said, in carving on fundamental rights we must use a scalpel, not an axe. See Pollard v. Roberts, 283 FSupp. 248, 258 (affirmed per curiam, 393 U. S. 14 (89 SC 47, 21 LE2d 14)).

I respectfully dissent.

I am authorized to state that Presiding Justice Nichols concurs in this dissent.

JORDAN, Justice, dissenting.

While I have concurred in the judgment of reversal and in the general language of the per curiam opinion I respectfully dissent from Division 7 of the opinion. Section 6 (b) of the Campaign Financing Disclosure Act states: "Where a candidate or campaign committee has accepted contributions or made expenditures *prior* to the effective date of this Act, the reports required by this

section shall include such information as the records of the candidate or his committee show, and such information as is otherwise known to the candidate or members of his committee, regarding such *prior* contributions and expenditures." (Emphasis supplied.) While we are here concerned only with constitutionality of the Act and not the wisdom thereof, this provision in my opinion is not only unwise but is patently unconstitutional. In my opinion this provision of the Act violates Art. I, Sec. III, Par. II of the Georgia Constitution in that it operates retrospectively. The appellants in their brief state: "A careful reading of that section in conjunction with the entire Act clearly reveals that the Act operates only prospectively and does not fall prey to the constitutional proscription of ex post facto and retroactive legislation." I do not so interpret the Act as it clearly imposes a duty upon a candidate to reveal records of contributions made prior to the effective date of the Act and in fact all contributions made within a twelve-month period prior to the first reporting date on June 29, 1974. The imposition of such an obligation is unconstitutional. I respectfully dissent from the holding to the contrary. However, the deletion of this particular provision of the Act does not destroy the general scheme of the Act.