28984. FULLER v. STATE OF GEORGIA et al.

PER CURIAM.

This appeal results from a judgment that validated "general obligation debt" to be incurred by the State of Georgia pursuant to a constitutional amendment ratified November 7, 1972 (Ga. L. 1972, p. 1523; Code Ann. §§ 2-5601 through 2-5604.1). This amendment provided that the state may incur general obligation debt, and it created the Georgia State Financing and Investment Commission (Code Ann. § 2-5603). It further provided: "The Commission shall be responsible for the issuance of all public debt incurred hereunder and for the proper application of the proceeds of such debt to the purposes for which it is incurred: . . ."

This constitutional amendment also provided that debt incurred by the state pursuant to its provisions "may be validated by judicial proceedings in the manner provided by the General Assembly and such validation shall be incontestable and conclusive." Code Ann. § 2-5602.

In 1973 the General Assembly enacted the "Georgia State Financing and Investment Commission Act" (Code Ann. Ch. 87-1A). Code Ann. § 87-103a (a) provides: "Subject to the limitations contained in this chapter, the Commission shall be responsible for the issuance of all public debt incurred hereunder, for the proper application of the proceeds of such debt to the purposes for which it is incurred, and for the application and administration of the provisions of this chapter: . . ." Code Ann. § 87-103a (b) (1) provides for a construction division of the commission, and it further provides as follows: "In carrying out its responsibilities in connection with the application of any funds under its control, (including the proceeds of any debt or any appropriation made directly

to it for construction purposes) the Commission is hereby specifically authorized to acquire and construct projects for the benefit of any department or agency of the State or to contract with any such department or agency for the acquisition or construction of projects under policies, standards, and operating procedures to be established by the Commission . . . The construction division shall also perform such construction-related services for State agencies and instrumentalities as may be assigned to the Commission or to the construction division by executive order of the Governor."

Code Ann. § 87-103a (d) vests the commission with powers in addition to those powers contained in the constitutional amendment.

Code Ann. § 87-105a (c) provides for the issuance of debt pursuant to written resolutions adopted by the commission. This section also provides for the legal procedure for validating the debt to be incurred by the state.

It is clear that under this new constitutional method of incurring state debt, if the legislature authorizes the commission to incur debt in a specified amount for a specified purpose and makes the specified appropriation to the "State of Georgia General Obligation Debt Sinking Fund" (as was done in this case), then the commission created by the Constitution can resolve to incur the authorized debt, have it procedurally validated, deliver evidences of the state debt to the lenders, and receive the proceeds from the lenders; and once the commission created by the Constitution receives the proceeds of the debt incurred from the lenders, then the commission itself is responsible for "the proper application of the proceeds of such debt to the purposes for which it is incurred." Code Ann. § 2-5603.

In this case the General Assembly appropriated $3,043,478 for the purpose of financing and constructing and equipping a World Congress Center in the City of Atlanta and authorized the issuance of $35 million in principal amount of general obligation debt. The General Assembly then provided: "Should the Georgia State Financing and Investment Commission elect to issue general obligation debt to finance said undertaking, said

amount shall be appropriated to the 'State of Georgia General Obligation Debt Sinking Fund.' " Ga. L. 1973, p. 1361.

These legislative requisites having been accomplished, the commission created by the Constitution then resolved to issue $35 million of general obligation debt for the purpose specified. The commission then took the necessary legal steps to validate the debt in advance of its being incurred. The appellant here intervened in the validation proceedings in the trial court to contest the validation of the proposed debt; his reasons for opposing validation were held by the trial judge to be without merit, and the trial judge entered a judgment validating $35 million of general obligation debt.

The appellant has come here seeking review of that judgment validating the debt.

I.

The appellant first contends that a proposed World Congress Center is not a purpose for which the power of taxation over the whole state may be exercised. This contention is without merit, because the 1972 constitutional amendment provides that general obligation debt may be incurred to acquire, construct, develop, extend, enlarge and improve land, waters, property, highways, buildings, structures, equipment or facilities of the state, its agencies, departments, and institutions. The constitutional amendment also provides that once such debt is incurred, the General Assembly shall raise by taxation such amounts as are necessary to pay the annual debt service requirements on all general obligation debt incurred pursuant to the constitutional amendment. Such amount shall be raised by taxation and appropriated by the General Assembly to the "State of Georgia General Obligation Debt Sinking Fund."

II.

Appellant's second contention is that the proposed World Congress Center is not a public purpose for which public debt may be incurred pursuant to subparagraph (c) of the 1972 constitutional amendment. This provision provides that general obligation debt may be incurred by issuing obligations to acquire, construct, develop, extend, enlarge or improve land, waters, property, highways,

buildings, structures, equipment or facilities of the state, its agencies, departments, and institutions.

The General Assembly in 1973 authorized $35 million of state debt to be incurred for the purpose of constructing a World Congress Center. It also appropriated the sum of $3,043,478 to the "State of Georgia General Obligation Debt Sinking Fund" as an amount sufficient to pay the highest annual debt service requirements for such $35 million of indebtedness to be incurred.

This court cannot hold that the debt authorized by the legislature to finance a World Congress Center is not for a public purpose, because we believe the 1972 constitutional amendment permits the legislature to authorize such debt for any purpose that is consistent with the terms, noted above, of subparagraph (c).

### III.

Appellant's third contention is that "no authorized user agency of the state has requested the issuance of state general obligation bonds to construct a World Congress Center." This contention has no merit. Under the 1972 constitutional amendment (Code Ann. § 2-5603) the Georgia State Financing and Investment Commission is responsible for the issuance of all public debt incurred pursuant to the amendment, and it is also responsible for the proper application of the proceeds of such debt to the purposes for which the debt is incurred.

### IV.

Appellant's fourth contention is that the Executive Board of the Georgia World Congress Center created by Ga. L. 1972, p. 245 violates the "separation of powers" provision of the State Constitution. Code Ann. § 2-123. We recognize that this fourth enumerated error raises an important constitutional issue because the Executive Board of the Georgia World Congress Center, if it was a part of the Executive Department, had six members of the Legislative Department appointed to it. However, we do not reach or grapple with that issue in this case, because the 1972 Act creating the Executive Board was repealed by the 1974 General Assembly, and the repeal was effective prior to the entry of the validating judgment in the trial court. Furthermore, the State

Financing and Investment Commission created by the 1972 constitutional amendment is primarily, totally, and singularly responsible for the proper issuance of the debt in this case and for the proper application of the proceeds of the $35 million debt to the purposes (financing, constructing, and equipping a World Congress Center) authorized by the General Assembly. After issuing the bonds or other evidences of debt, it is the Georgia State Financing and Investment Commission's duty and responsibility to use and apply the proceeds properly and legally.

*Judgment affirmed. All the Justices concur, except Hall, J., who concurs specially in Division IV.*

ARGUED JUNE 25, 1974 — DECIDED JULY 25, 1974.

*Brent, Castellani & Smith, Robert J. Castellani,* for appellant.

*Arthur K. Bolton, Attorney General, Lauren O. Buckland, Assistant Attorney General, Lewis R. Slaton, District Attorney, King & Spalding, Pope B. McIntire, Robert L. Steed, Gambrell & Mobley, John H. Mobley, II,* for appellees.

HALL, Justice, concurring specially in Division IV.

I cannot concur in what is said in Division IV of the majority opinion for the reason that it fails to make a definitive ruling on the most important question raised in this appeal: What results flow from the violation of the separation of powers doctrine. Neither can I agree that the Georgia State Financing and Investment Commission is the sole agency for carrying out "the purposes (financing, construction and equipping of the World Congress Center)" of the debt. The majority opinion leaves a cloud on many of the contracts that have been previously entered into by the Executive Board and, even more important, a cloud on future contracts. In my opinion the legality of expending $35,000,000 of tax funds through the machinery created to date is a matter of such grave public interest, that I am compelled to address this issue and set forth my interpretation of the law.

The Intervenor enumerates as error the trial court's overruling of his objection that the Executive Board of the World Congress Center created by Ga. L. 1972, p. 245 violates the "separation of powers" provision of the Georgia Constitution of 1945, Art. I, Sec. I, Par. XXIII (Code Ann. § 2-123).[1]

To illustrate the relevance of the actions of the board to the decision to issue the bonds it is necessary to trace the legislative and procedural history of the decision. "General obligation debt may be incurred by issuing obligations to acquire, construct, develop, extend, enlarge or improve land, waters, property, highways, buildings, structures, equipment or facilities of the State, its agencies, departments, institutions and those State Authorities which were created and activated prior to the Amendment adopted November 8, 1960 to Art. VII, Sec. VI, Par. I (a) of this Constitution." Code Ann. § 2-5601. "General obligation debt may not be incurred until the General Assembly has enacted legislation stating the purposes in general or specific terms, for which such issue of debt is to be incurred, specifying the maximum principal amount of such issue and appropriating an amount at least sufficient to pay the highest annual debt service requirements for such issue." Code Ann. § 87-104a (a). The initial steps taken to create this debt were (1) a request by the user entity to the General Assembly for budget approval of the capital outlay program or project, and (2) a request by the user entity to the Georgia State Financing and Investment Commission to finance the capital outlay programs or projects. Contrary to what is said in the majority opinion, the commission is not the user entity; it acts "for the benefit of any department or agency of the State . . ." Code Ann. § 87-103 a (b) (1).

The initial action triggering the request for a general obligation debt to construct a World Congress

---

[1] "The legislative, judicial and executive powers shall forever remain separate and distinct, and no person discharging the duties of one, shall, at the same time, exercise the functions of either of the others, except as herein provided."

Center came from the seventeen member Executive Board of the World Congress Center, an agency of the state created in 1972 by the General Assembly, which contained six members of the legislative branch of government. The board was given broad executive powers.[2] This board by resolution called upon the Department of Community Development and the Georgia State Financing and Investment Commission to proceed with the acquisition and construction of the proposed World Congress Center through the issuance of general obligation bonds not to exceed $35,000,000. The General Assembly provided in its 1973 Appropriations Act (Ga. L. 1973, pp. 1353, 1361 (Section 13, Department of Community Development)) $200,000 operating expenses World Congress Center and $3,043,478 State of Georgia General Obligation Debt Sinking Fund. The Department of Community Development by resolution recited the above stated actions by both the Executive Board of the World Congress Center and the General Assembly and requested the commission to issue the general obligation bonds in the amount and for the purpose stated above. Acting upon the above request, the Georgia State Financing and Investment Commission voted on January 16, 1974 to issue these general obligation bonds.

---

[2] "The Executive Board shall grant final approval for the overall plan and design of the Georgia World Congress Center and the site for the Center. The Executive Board shall select an architectural firm to prepare the overall plan and design of the Georgia World Congress Center. . . . The Executive Board shall select the site for the Center. The Executive Board shall select the principal group or organization which will operate and manage the Georgia World Congress Center, and the Executive Board is hereby authorized to execute any and all instruments which may be necessary to lease the Georgia World Congress Center and to prescribe the terms and conditions of the lease . . . The Executive Board shall function in a permanent capacity to supervise the overall operations of the Georgia World Congress Center." Ga. L. 1972, pp. 245, 246.

Based upon the above history, Intervenor contends that the bonds may not be validly issued because the action of the Executive Board of the World Congress Center in initiating the request for the bonds is void for the reason that this body violates the separation of powers provision of the State Constitution in that members of the legislative branch of government are performing executive functions, and that the case should be remanded to the Department of Community Development for that body to exercise its independent judgment as to whether it will make the request as the appropriate user agency for a World Congress Center.

The Executive Board of the World Congress Center contains members of both the legislative and executive branches of government and possesses extensive powers and duties with respect to the operation of the Georgia World Congress Center.[3]

"It is a fundamental principle of the American governmental system that the legislature cannot usurp the powers of the executive department by exercising functions of the latter. The legislature can neither enforce the laws which it has the power to make, nor, in the usual instance, appoint the agents charged with the duty of such enforcement. A state legislature may not confer purely executive power on a committee of its own members. And the appointment of managers of government property or business is essentially an executive act which the legislature is without capacity to perform directly or through any of its members. . ." 16 AmJur2d 481-482, Constitutional Law, § 231. Clearly the presence of members of the legislature on this Executive Board constitutes a violation of the principle of separation of powers.[4] See Springer v. Philippine Islands, 277 U. S. 189 (48 SC 480, 72 LE 845); *Ogletree v. Dozier,* 59 Ga. 800; *Hilliard v. Connelly,* 7 Ga. 172; *Hawkins v. State,* 130 Ga. App. 426, 428 (203 SE2d 622); McElreath, A Treatise on the Constitution of Georgia, § 1124 (Atlanta

---

[3] See Note 2, supra.

[4] In 1974, the General Assembly of Georgia amended this Act "to change the name of the Executive Board of the Georgia World Congress Center; [and] to reconstitute

1912); 16 CJS 547, Constitutional Law, § 130. The question then is whether the board's actions are for this reason invalid and this question may be answered only by determining whether the board itself, being improperly constituted, was null and void from the beginning, or whether the invalid portion of it may be struck leaving an operative board whose past actions are at least in part salvageable.[5]

---

and continue the Executive Board of the World Congress Center as an authority. . . ." Ga. L. 1974, p. 174. The Center Authority is faced with the same problem as the Executive Board it contains six members of the legislative branch of government and possesses similar executive powers. It should be noted that *Sheffield v. State School Building Authority,* 208 Ga. 575 (68 SE2d 590) is inapposite here. Just "because an agency is designated by the law as an 'authority' does not mean that it is or is not a certain thing, or that it can or cannot take certain actions." 3 Encyc. of Ga. L. 12, Authority Financing, § 6. For example, the Agricultural Commodities Authority (Ga. L. 1951, p. 717) was ruled to be unconstitutional under the separation of powers provision (Code Ann. § 2-123) in an opinion of the Attorney General (1950-51, p. 234). Later this court held another part of that Act unconstitutional stating that "The State can never do indirectly what it cannot lawfully do directly." *Agricultural Commodities Authority v. Balkcom,* 215 Ga. 107, 109 (109 SE2d 276). This court held that the financing authority in *Sheffield,* supra, was not "the State, or a part of the State, or an agency of the State. . . "; it was "an institution of purely public charity." In my opinion the Center Authority is an agency of the state in the same manner as any executive authority as distinguished from a financing authority, and therefore the separation of powers problem cannot be ignored.

[5]Some members of this court appear to be of the view that a violation of the separation of powers provision will render the entire board or Authority null and void.

There is a remarkable dearth of authority on the question whether a body so constituted as to violate the separation of powers doctrine is totally void or only void in part. Springer v. Philippine Islands, supra, does not answer this question, (see, Note, 42 Harv. L. Rev. 426) though the discussion of the Supreme Court revolves tantalizingly close to the issues here presented. However, my research persuades me that there is possibly no authority for the "total invalidity" view and there is at least some authority for the opposite view which, as it comports more closely with logic and reason as well as with precedent, I hereby specifically adopt.

It is familiar concept that where an Act of the legislature contains a portion which is invalid because unconstitutional, the Act does not fall in toto if there is enough left to carry out the legislature's intention. *Fortson v. Weeks,* 232 Ga. 472; *McCaffrey v. State,* 183 Ga. 827, 830 (189 SE 825); *Bennett v. Wheatley,* 154 Ga. 591 (2) (115 SE 83); *Papworth v. State,* 103 Ga. 36 (2) (31 SE 402); *Elliott v. State,* 91 Ga. 694 (1) (17 SE 1004). Is there anything about the separation of powers doctrine which leads to the conclusion that a violation thereof is any more fatal to a statute than the violation of another constitutional provision? There is not. For example, in *Northeastern R. Co. v. Morris,* 59 Ga. 364 one section of an Act of the legislature was held to violate the separation of powers doctrine in that it authorized a lawsuit by a private citizen to prevent entirely a railroad company's otherwise obtainable recourse to the executive branch of government. This section of the Act was struck down, but the remainder stood.

Granting, then, that an invalid commingling of governmental powers is not alone necessarily sufficient to void a statute in its entirety, we must face the narrower question of whether the defect in a board which is improperly peopled by members of both the executive and legislative branches of government totally invalidated its actions from the beginning.

In *Hilliard v. Connelly,* 7 Ga. 172, supra, an Act of 1837 authorized a body composed of the Governor, the Secretary of State, the Surveyor General and the

Comptroller General to correct errors in land grants. This court held that the actions of that body were valid where the only dispute was between the state and the grantee, but when the interests of third persons were involved the judicial question of title to land was being determined by an executive body in violation of the separation of powers doctrine. Holding that the Act was unconstitutional and that the legislature could bestow no such powers, the court wrote "all such questions [of title] *as far as third persons are concerned, . . .* belong to the courts." Id., p. 181. (Emphasis supplied.) Thus, that portion of the governmental body's duties which violated the separation of powers was transferred to the proper arm of government, but the opinion contains no intimation that past or future acts of that body which lay within the area of its unchallenged competence were unsettled by the decision. *Hilliard v. Connelly,* though not on all fours with our case, is nonetheless a clear signal that only the void portion—that is, the legislative members — of the Executive Board of the World Congress Center, need be eliminated, and that the board need not fall entirely.

This conclusion also receives inferential support from recent cases illustrating in other contexts that errors in the selection method and composition of governmental bodies will not necessarily invalidate either the past or future actions of those bodies. E.g., Reservists Committee to Stop the War v. Laird, 323 FSupp. 833 (D. DC 1971); Wesberry v. Sanders, 376 U. S. 1 (84 SC 526, 11 LE2d 481). In the Reservists case the district court found a violation of the separation of powers in Congressmen's holding positions in the armed forces reserves. Nonetheless, the court refused to order action, deciding that attrition and voluntary moves by Congress and its affected members would cure the problem. See generally, Note, 40 George Washington L. Rev. 542 (1972). Most importantly, the court by no means cast doubt on the actions of Congress taken during the continuation of the unconstitutional condition. Similarly, in Wesberry v. Sanders, the method by which many states elected members to the House of Representatives was

declared unconstitutional as an abridgement of the right to vote. Though Mr. Justice Harlan, dissenting, pointed out (p. 21) the clear implication of the majority opinion, that "today's decision impugns the validity of the election of 398 Representatives from 37 States, leaving a 'constitutional' House of 37 members now sitting . . ." nonetheless the majority opinion impliedly acquiesced in the validity of past and even future actions of the House.

In conclusion, it is my judgment that because members of the legislative branch of government were sitting on this executive board which purported to engage in executive functions, the board as it has been constituted has violated the separation of powers doctrine. However, from the foregoing reasoning and authorities it does not follow that the past actions of the board were necessarily void if, stripped of this invalid characteristic, they were otherwise unobjectionable. There have been many members of the board to whose service thereon there is no objection. The board's past actions need not be declared void if examination of the record of those actions shows that the improper participation of the legislative members was not decisive of the result. See *Sears v. State of Georgia,* 232 Ga. 547. Moreover, after removal of the legislative members, a reconstituted board may ratify prior actions of the old board.

In any event, notwithstanding any challenge to the board, the actions taken by the board do not require invalidation of these bonds inasmuch as the controlling actions were taken by the Department of Community Development. Intervenor argues that the department did not exercise its discretion independently, but felt itself bound by the prior decisions of the executive board. The record, however, does not substantiate this assertion. The department's resolution requesting the bonds appears on its face to manifest independent judgment, and it enjoys a presumption, here unrebutted, of validity.

I concur in the judgment validating the bonds.